UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

PIERRE KOHLER,                                          :
                                                       :         Case No.: _____
                           Plaintiff,                  :
                                                       :         **COMPLAINT**
        -against-                                      :
                                                       :         **DEMAND FOR JURY TRIAL**
WPX ENERGY, INC., RICHARD E.                           :
MUNCRIEF, CLAY M. GASPAR,                              :
KIMBERLY S. LUBEL, JOHN A. CARRIG,                     :
KELT KINDICK, ROBERT K. HERDMAN,                      :
VALERIE M. WILLIAMS, KARL F. KURZ,                     :
D. MARTIN PHILLIPS, and DOUGLAS E.                    :
SWANSON JR.,                                           :
                                                       :
                           Defendants.                 :

-------------------------------------- X

        Plaintiff, Pierre Kohler ("Plaintiff"), by Plaintiff's undersigned attorneys, for this

complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon

information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations

herein, as follows:

## NATURE OF THE ACTION

        1.      This is an action brought by Plaintiff against WPX Energy, Inc. ("WPX" or the

"Company") and the members of the Company's board of directors (collectively referred to as the

"Board" or the "Individual Defendants" and, together with WPX, the "Defendants") for their

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission

("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the

proposed merger (the "Proposed Transaction") of WPX and Devon Energy Corporation

("Devon").

2.       On September 26, 2020, WPX and Devon entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which WPX will merge with and into Devon, with Devon continuing as the surviving company (the "Proposed Transaction").

3.       Pursuant to the terms of the Merger Agreement, WPX's shareholders will be entitled to receive 0.5165 shares of Devon common stock per share of WPX common stock they own (the "Exchange Ratio" or the "Merger Consideration").  Based on Devon's trading price on September 25, 2020, the last trading day before the public announcement of the signing of the Merger Agreement, the Merger Consideration was worth approximately $5.53 per share of WPX common stock

4.       On or about December 4, 2020, in order to convince WPX's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

5.       In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by WPX's financial advisors, Citigroup Global Markets Inc. ("Citi" or the "Financial Advisors") regarding the Proposed Transaction.

6.       The Proposed Transaction is expected to close in the first quarter of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled for December 30, 2020.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7.       For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to WPX's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, WPX's securities trade on the New York Stock Exchange

("NYSE"), which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of WPX common stock.

12.     Defendant WPX is a Delaware corporation headquartered in Tulsa, Oklahoma that is an independent oil and natural gas exploration and production company engaged in the development of long-life unconventional properties.   WPX's principal executive offices are located at 3500 one Williams Center, Tulsa, Oklahoma 74172.  WPX's common stock trades on the NYSE under the ticker symbol "WPX."

13.     Defendant Richard E. Muncrief ("Muncrief") is, and has been at all relevant times, the Company's Chief Executive Officer and Chairman of the Company's Board of Directors.

14.     Defendant Clay M. Gaspar ("Gaspar") is, and has been at all relevant times, the Company's President and Chief Operating Officer, and a director of the Company.

15.     Defendant Kimberly S. Lubel ("Lubel") is, and has been at all relevant times, a director of the Company.

16.     Defendant John A. Carrig ("Carrig") is, and has been at all relevant times, a director of the Company.

17.     Defendant Kelt Kindick ("Kindick") is, and has been at all relevant times, the Lead Independent Director of the Company.

18.     Defendant Robert K. Herdman ("Herdman"), is and has been at all relevant times, a director of the Company.

19.     Defendant Valerie M. Williams ("Willimas") is, and has been at all relevant times,

a director of the Company.

20.    Defendant Karl F. Kurz ("Kurz") is, and has been at all relevant times, a director of the Company.

21.    Defendant D. Martin Phillips ("Phillips") is, and has been at all relevant times, a director of the Company.

22.    Defendant Douglas E. Swanson, Jr. ("Swanson") is, and has been at all relevant times, a director of the Company.

23.    The Defendants identified in paragraphs 13 through 22 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

24.    WPX is a publicly traded Delaware corporation headquartered in Tulsa, Oklahoma that is an independent oil and natural gas exploration and production company engaged in the development of long-life unconventional properties.  WPX's common stock is traded on the NYSE under the ticker symbol "WPX."

25.    WPX is focused on profitably exploiting, developing, and growing its oil positions in the Delaware Basin (a subset of the Permian Basin) in Texas and New Mexico and the Williston Basin in North Dakota.  WPX's financial results are reported in a single industry segment.

26.    Incorporated in 2011, WPX is focused on disciplined production growth within its cash flow and cost reductions, and since mid-2014 has undertaken billions of dollars in asset acquisitions and divestitures, allowing WPX to focus on or grow core areas and strengthen its financial position.  As a result, WPX was positioned for continued, sustained economic growth in

the coming years.

27.      Indeed, on July 29, 2020, less than two months before the Proposed Transaction was announced, WPX issued a press release entitled *WPX Energy Reports 2Q 2020 Results*, which explained that WPX's strategies helped insulate the Company from COVID-19, stating in part:

> "Our proactive risk mitigation strategy that included work on bolstering our balance sheet and building an industry-leading hedge book gives us flexibility, revenue certainty and stability in our development program against the unusual backdrop caused by COVID-19," said Rick Muncrief, chairman and chief executive officer.
>
> "This operational continuity benefits us not only in 2020, but in 2021 and 2022 as we think about the cadence of how to optimize our resources, manage capital requirements and enhance our free cash flow capabilities.
>
> "For the quarter, our adjusted EBITDAX and free cash flow highlight the strength of our assets, our disciplined approach to risk management, and our thoughtful ability to work through challenges.
>
> "We also added hedges for our 2021 oil volumes, proactively reshaped our debt towers, and showed improved performance on our new Felix assets by adjusting the completion design.
>
> "I'm grateful for our resilient employees and service providers who quickly and safely ramped down activity and stayed ready to get back to work. Our teams are a differentiating factor in our success," Muncrief added.

28.      Thus, the Proposed Transaction comes at a time when WPX's future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" WPX's public stockholders with Merger Consideration that fails to adequately compensate them for the intrinsic value of their shares.

29.      Despite WPX's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that deprives WPX's public shareholders of the ability to partake in the Company's individual growth and instead dilutes the value of their WPX shares with an inadequate interest in Devon.  The Individual Defendants breached their fiduciary duties owed to WPX's shareholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by

allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration while Company insiders receive millions of dollars in severance payments and accelerated vesting of their restricted stock units.

**The Proposed Transaction**

30. On September 28, 2020, before trading markets opened, Devon and WPX issued a joint press release to announce the Proposed Transaction, which stated in part:

### DEVON ENERGY AND WPX ENERGY TO COMBINE IN MERGER OF EQUALS

9/28/2020

*Creating a Leading Energy Company Focused on Generating Free Cash Flow and Return of Capital to Shareholders*

- Merger of equals creates a leading unconventional oil producer in the U.S.

- Builds a dominant Delaware Basin acreage position totaling 400,000 net acres

- All-stock transaction accretive to per-share metrics in year one and maintains financial strength

- Expect to achieve cost savings that will drive $575 million of annual cash flow improvements by YE 2021

- Maintenance capital funding requirements in 2021 improve to $33 WTI and $2.75 Henry Hub pricing

- Enhanced operating scale accelerates transformation to a cash-return business model

- Combined company to implement "fixed plus variable" dividend strategy

- Dave Hager to serve as executive chairman of the board; Rick Muncrief to serve as president and CEO

**TULSA, Okla.—(BUSINESS WIRE)**—Devon Energy ("Devon") (NYSE: DVN) and WPX Energy ("WPX") (NYSE: WPX) today announced they have entered into an agreement to combine in an all-stock merger of equals transaction.

The strategic combination will create a leading unconventional oil producer in the U.S., with an asset base underpinned by a premium acreage position in the economic core of the Delaware Basin.

The combined company, which will be named Devon Energy, will benefit from enhanced scale, improved margins, higher free cash flow and the financial strength to accelerate the return of cash to shareholders through an industry-first "fixed plus variable" dividend strategy.

**TRANSACTION DETAILS**

Under the terms of the agreement, WPX shareholders will receive a fixed exchange ratio of 0.5165 shares of Devon common stock for each share of WPX common stock owned. The exchange ratio, together with closing prices for Devon and WPX on Sept. 25, 2020, results in an enterprise value for the combined entity of approximately $12 billion.

Upon completion of the transaction, Devon shareholders will own approximately 57 percent of the combined company and WPX shareholders will own approximately 43 percent of the combined company on a fully diluted basis.

The transaction, which is expected to close in the first quarter of 2021, has been unanimously approved by the boards of directors of both companies. Funds managed by EnCap Investments L.P. own approximately 27 percent of the outstanding shares of WPX and have entered into a support agreement to vote in favor of the transaction. The closing of the transaction is subject to customary closing conditions, including approvals by Devon and WPX shareholders.

**CEO COMMENTARY**

"This merger is a transformational event for Devon and WPX as we unite our complementary assets, operating capabilities and proven management teams to maximize our business in today's environment, while positioning our combined company to create value for years to come," said Dave Hager, Devon's president and CEO.

"Bringing together our asset bases will drive immediate synergies and enable the combined company to accelerate free cash flow growth and return of capital to shareholders. In addition to highly complementary assets, Devon and WPX have similar values, and a disciplined returns-oriented focus, reinforcing our belief that this is an ideal business combination," Hager added.

"This merger-of-equals strengthens our confidence that we will achieve all of our five-year targets outlined in late 2019," said Rick Muncrief, WPX's chairman and CEO.

"The combined company will be one of the largest unconventional energy producers in the U.S. and with our enhanced scale and strong financial position, we can now accomplish these objectives for shareholders more quickly and efficiently. We will create value for shareholders of both companies through the disciplined management of our combined assets and an unwavering focus on profitable, per-share growth," Muncrief added.

**STRATEGIC RATIONALE**

- **Accelerates cash-return business model** – The merger accelerates Devon's transition to a business model that prioritizes free cash flow generation over production growth. With this highly disciplined strategy, management is committed to limiting reinvestment rates to approximately 70 to 80 percent of operating cash flow and restricting production growth to 5 percent or less annually. Free cash flow will be deployed toward higher dividends, debt reduction and opportunistic share repurchases.

- **Immediately accretive to financial metrics** – The transaction is expected to be immediately accretive to all relevant per-share metrics in the first year, including: earnings, cash flow, free cash flow, and net asset value, as well as accretive to return on invested capital. The combination is also expected to enhance the company's credit profile and decrease its overall cost of capital.

- **Maintains strong balance sheet and liquidity** – The all-stock transaction ensures the combined company will retain a strong balance sheet with a pro forma net debt-to-EBITDAX ratio of 1.6x on a trailing 12-month basis and is targeting a leverage ratio of approximately 1.0x over the longer term. The combined company will also have excellent liquidity with approximately $1.7 billion of cash on hand and $3 billion of undrawn capacity on its credit facility expected at closing.

- **Increases scale and diversification** – The transaction creates one of the largest unconventional oil producers in the U.S. with production of 277,000 barrels per day. The combined company will benefit from a premier multi-basin portfolio, headlined by the world-class acreage position in the Delaware Basin that is 400,000 net acres and accounts for nearly 60 percent of the combined company's total oil production. The Delaware Basin acreage is geographically diversified between southeast New Mexico and Texas, with only 35 percent of the leasehold on federal land. The consolidated Delaware footprint provides a multi-decade inventory of high-return opportunities at combined activity levels of 17 drilling rigs. The balance of the portfolio will be diversified across high-margin, high-return resource plays in the Anadarko Basin, Williston Basin, Eagle Ford Shale and Powder River Basin.

- **Drives significant cost synergies** – Cost savings from initiatives underway in the second half of 2020 and synergies resulting from the merger are expected

to drive $575 million in annual cash flow improvements by year-end 2021. These cost improvements are expected to be attained through operational efficiencies, general and administrative savings and reduced financing expense. The net present value of these cost synergies over the next 5 years equates to more than $2 billion of value. The all-stock transaction structure allows shareholders of both Devon and WPX to benefit from the cost synergies and significant upside potential of the combined company.

- **Supports implementation of a "fixed plus variable" dividend strategy** – With the business scaled to consistently generate free cash flow, Devon is initiating a new dividend strategy that pays a fixed dividend and evaluates a variable distribution on a quarterly basis. The fixed dividend is paid quarterly at a rate of $0.11 per share and the target payout is approximately 10 percent of operating cash flow. In addition to the fixed quarterly dividend, up to 50 percent of the remaining free cash flow on a quarterly basis will be distributed to shareholders through a variable distribution. This enhanced dividend strategy is effective immediately upon close of the transaction.

- **Shared commitment to ESG excellence –** Both Devon and WPX share an uncompromising commitment to ESG leadership, employee safety and environmental responsibility. Consistent with this commitment, the combined company will pursue measurable ESG targets, including methane intensity reduction, and will have progressive actions and practices in place to advance inclusion and diversity. Further, ESG metrics will be incorporated into the compensation structure and the board will monitor ESG goals and results.

- **Combines complementary cultures –** Devon and WPX share similar values and this combination is designed to optimize the strengths of both companies' operating philosophies to drive the continued growth and success of the business.

## LEADERSHIP AND HEADQUARTERS

Following the merger, the board of directors will consist of 12 members, 7 directors from Devon and 5 from WPX including the lead independent director. Dave Hager will be appointed executive chairman of the board, and Rick Muncrief will be named president and CEO.

The combined company's executive team will include Jeff Ritenour as executive vice president and chief financial officer, Clay Gaspar as executive vice president and chief operating officer, David Harris as executive vice president and chief corporate development officer, Dennis Cameron as executive vice president and general counsel, and Tana Cashion as senior vice president of human resources. The combined company will be headquartered in Oklahoma City.

## PRELIMINARY PRO FORMA 2021 OUTLOOK

Detailed forward-looking guidance for the full-year 2021 will be provided upon closing of the transaction. Based on current supply and demand dynamics, product inventory levels, and other leading economic indicators, the company expects to design capital activity plans to maintain base production.

The maintenance capital requirements to keep oil production flat in 2021 versus 2020 fourth-quarter exit rates of greater than 280,000 barrels per day is estimated at approximately $1.7 billion. Pro forma for cost synergies, these maintenance capital requirements in 2021 are estimated to be funded at $33 WTI and $2.75 Henry Hub pricing.

**ADVISORS**

J.P. Morgan Securities LLC is serving as financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP is serving as legal advisor to Devon. Citi is serving as financial advisor and Kirkland & Ellis LLP is serving as legal advisor to WPX. Vinson & Elkins LLP is serving as legal advisor to EnCap Investments L.P.

**The Preclusive Deal Protection Devices**

31.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

32.     The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

33.     These no-shop provisions also require the Board to provide Devon written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Devon following receipt of the notice, so that Devon has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

34.     In addition, the Merger Agreement provides that the Company will be required to pay to Devon a termination fee of $75,000,000.00 with respect to any termination under the No-Shop provisions of the Merger Agreement.

35.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public shareholders' ability to disapprove the Proposed Transaction.

36.     Indeed, the Proposed Transaction was negotiated through a flawed and conflicted sales process pursuant to which WPX conducted insufficient outreach and steered the transaction to Devon by accelerating the merger process and negotiating the merger during the coronavirus pandemic.

37.     The aggregate effect of the preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted sales process pursuant to which the Proposed Transaction was negotiated, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

38.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

39.     On or about December 4, 2020, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and

20(a) of the Exchange Act.

40.     The special meeting of WPX's shareholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

41.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

42.     The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

43.     The Proxy fails to disclose material information regarding Company C's interest in acquiring WPX, including (i) the premium contemplated by the preliminary indication of interest that Company C provided in December 2019, and (ii) the type of consideration contemplated by Company's preliminary indication of interest.  The magnitude of the premium and type of consideration that Company C previously offered is undoubtedly material because (i) WPX effectively immediately assented to Devon's condition that a merger be "on a low to no premium basis" because of a "mutual belief that investors would only be supportive of transactions with a low or no premium," and (ii) WPX considered "the use of Devon stock for 100% of the transaction consideration[] would give WPX stockholders greater participation in any energy market

recovery."  Registration Statement, 54-55, 57-58.

44.     The Proxy also fails to disclose material information regarding Company C's ability to make a superior proposal to acquire WPX in light of the announcement of the Proposed Transaction.   For example, the Merger Agreement includes a "fiduciary out" clause, which authorizes the waiver or release of standstill obligations upon request by a third party to the extent necessary to permit the third party to make an Acquisition Proposal but fails to disclose: (i) whether WPX has previously executed a standstill agreement with Company C, and if so, (ii) whether the standstill agreement contained "Don't Ask, Don't Waive" ("DADW") provisions such that Company C cannot make an unsolicited request for WPX to release the standstill obligations.   In other words, if Company C is bound by a DADW provision, then the purported "fiduciary out" clause is entirely illusory.  *See Koehler v. NetSpend Holdings, Inc.*, C.A. No. 8373-VCG, 2013 Del. Ch. LEXIS 131, at *71-72 (Del. Ch. Ct. May 21, 2013).

45.     The  Proxy fails to disclose important details regarding the Board's involvement in the merger process, including (i) whether the Board considered appointing a Special Committee, and (ii) why it did not do so as it became increasingly apparent that a proposed merger with Devon would contemplate the retention of certain WPX named executive officers (including Muncrief as CEO), even as WPX shareholders would only have 43% ownership of the combined company, (iii) why the obviously-conflicted Muncrief and Gaspar were asked to leave the September 13 and 15-16, 2020 Board meetings Board meetings for "executive session" but permitted to make substantive presentations regarding Company C and Devon, and (iv) the reasons that EnCap, WPX's largest stockholder, would support a transaction with Devon but not with Company C and whether all of the independent directors of WPX agreed with Muncrief, Gaspar, and the directors who were also principals of EnCap that WPX should not explore a possible transaction with

Company C.

**B.** **The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

46.     The Proxy also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations.  Without this information, shareholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

47.     With respect to the WPX Standalone Projections beginning on Page 87, the Registration Statement fails to disclose (i) the Projected cash flow amounts, and (ii) the following line-items used to derive the projected cash flow amounts: (a) Revenue, (b) Operating expenses, (c) Depreciation (or depletion) and amortization, adjusted for exploration expense (d) Interest, (e) General and administrative costs, (f) Taxes (or tax rate), (g) Non-recurring, non-cash and other items, (h) Stock-based compensation, and (i) the value of WPX's Net Operating Loss carryforwards used in the discounted cash flow analysis.

48.     With respect to the WPX standalone projections, the Proxy also fails to disclose the Company Projections for WPX Standalone net income (loss), operating income (loss), and other financial performance metrics that are prepared in accordance with GAAP.

49.     With respect to the WPX standalone projections, the Proxy also fails to disclose the pro-forma financial effects of the merger, including the costs of integration and the projected value of combined company synergies such as cost savings, strategic implications, and financial and operational benefits, which were relied upon by the Board in projecting the merger "to be immediately accretive to free cash flow."  Proxy, 73-74.

50.     With respect to Citi's *Selected Public Companies Analysis* beginning on Page 82, the Registration Statement fails to provide with respect to WPX: (i) Citi's basis and rationale for considering the selected companies as "generally relevant for purposes of analysis," (ii) the individual multiples for each of the selected companies, (iii) the full rationale and basis that Citi employed and relied on in selecting calendar year 2021 and calendar year 2022 EBITDA multiple reference ranges for WPX of 4.1x to 5.3x and 3.4x to 4.6x, respectively, and (iv) the full rationale and basis that Citi employed and relied on in selecting calendar year 2021 and calendar year 2022 Cash Flow Per Share multiple reference ranges for WPX of 2.0x to 4.0x and 1.7x to 3.3x, respectively.

51.     With respect to Citi's *Selected Public Companies Analysis* beginning on Page 82, the Registration Statement fails to provide with respect to Devon: (i) Citi's basis and rationale for considering the selected companies as "generally relevant for purposes of analysis," (ii) the individual multiples for each of the selected companies, (iii) the full rationale and basis that Citi employed and relied on in selecting calendar year 2021 and calendar year 2022 EBITDA multiple reference ranges for Devon of 3.9x to 5.3x and 3.3x to 4.6x, respectively, and (iv) the full rationale and basis that Citi employed and relied on in selecting calendar year 2021 and calendar year 2022 Cash Flow Per Share multiple reference ranges for Devon of 2.2x to 4.0x and 1.8x to 3.3x, respectively.

52.     With respect to Citi's *Discounted Cash Flow Analyses* ("DCF") beginning on Page 84, the Proxy fails to provide: (i) the projected cash flow and net operating loss amounts, (ii) Citi's full basis and rationale for applying a discount rate range of 7.7% to 8.5% for WPX and a discount rate range of 7.8% to 8.8% for Devon, (iii) Citi's rationale and basis for calculating terminal values for WPX and Devon by applying a range of adjusted fiscal year 2025 EBITDA multiples 3.9x to 5.3x and 3.9x to 5.3x, respectively, and (iv) full sensitivity tables that summarize the implied valuations across the full range of assumptions.

53.     With respect to Citi's *Net Asset Value Analysis* beginning on Page 85, the Proxy fails to disclose: (i) the net operating loss amounts, (ii) Citi's full basis and rationale for applying a discount rate of 7.7% to 8.5% for WPX and 7.8% to 8.8% for Devon, (ii) the cash flows amounts forecasted from WPX's and Devon's proved developed producing reserves and currently undeveloped reserves, (iii) the amounts of the projected midstream distributions of Catalyst Midstream partners LLC to WPX during fiscal years ending December 31, 2021 through December 31, 2025, including Citi's rationale and basis for employing a terminal adjusted EBITDA multiple of 4.1x, and (iv) full sensitivity tables that summarize the implied valuations across the full range of assumptions.

54.     With respect to Citi's *Illustrative Has/Gets Analysis* beginning on Page 85, the Registration Statement fails to disclose the pro forma combined company synergies amounts anticipated by WPX and Devon management.

55.     If a proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a

company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed in the Registration Statement misleading.

56.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title."  15 U.S.C. § 78n(a)(1).

59.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

60.    The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

61.    Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

62.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

63.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

64.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

65.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

66.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

71.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

74.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

//

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  December 8, 2020                 **MONTEVERDE & ASSOCIATES PC**

**OF COUNSEL**                                     By: */s/ Juan E. Monteverde*
                                                              Juan E. Monteverde (JM-8169)
**ADEMI LLP**                                        The Empire State Building
Guri Ademi                                              350 Fifth Avenue, Suite 4405
Jesse Fruchter                                         New York, NY 10118
3620 East Layton Avenue                      Tel: (212) 971-1341
Cudahy, Wisconsin 53110                     Fax: (212) 202-7880
Tel: (414) 482-8000                              Email: jmonteverde@monteverdelaw.com
Fax: (414) 482-8001
Email: gademi@ademilaw.com                *Attorneys for Plaintiff*
           jfruchter@ademilaw.com

*Attorneys for Plaintiff*